UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY HART,                          *
                                       *
        Plaintiff,                     *
                                       *
            v.                         *        No. 16-cv-10690-ADB
                                       *
CAROLYN W. COLVIN,                     *
*Acting Commissioner of Social Security*, *
                                       *
        Defendant.                     *

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

## I.    INTRODUCTION

Plaintiff Timothy Hart brings this action pursuant to § 205(g) of the Social Security Act,

42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security

Administration denying his claims for Social Security Disability Insurance ("SSDI") and

Supplemental Security Income ("SSI") benefits. Before the Court is Mr. Hart's Motion to

Reverse the Decision of the Commissioner of Social Security [ECF. No. 16], which seeks to

reverse or remand the ALJ decision denying him benefits, and the Commissioner's Motion to

Affirm the Decision of Commissioner [ECF No. 19]. For the reasons explained below, the Court

concludes that the ALJ's decision was supported by substantial evidence. Therefore, Mr. Hart's

motion to reverse or remand is <u>DENIED</u>, and the Commissioner's motion to affirm is

<u>ALLOWED</u>.

## II.    BACKGROUND

### A.    Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act ("the Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> [a]ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional

capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

## B.    Procedural Background

On February 27, 2013, Mr. Hart filed his application for SSDI benefits. [R. 83].[1] Soon

thereafter, on April 4, 2013, he also applied for SSI benefits. [R. 84]. He alleged in both

applications that he became disabled on March 21, 2012 due to bipolar disorder and sleep apnea.

[R. 85, 95, 202, 209]. On August 5, 2013, the Social Security Administration ("SSA") denied

Mr. Hart's applications, and again upon reconsideration on October 3, 2013. [R. 131–36, 144–

46]. On October 7, 2013, Mr. Hart requested an administrative hearing [R. 147], which took

place before Administrative Law Judge ("ALJ") Francis Hurley on July 10, 2014 [R. 31]. Mr.

Hart, who was represented by counsel, appeared and testified at the hearing. [R. 13]. On

November 24, 2014, the ALJ issued a decision finding that Mr. Hart was not disabled, and

therefore not entitled to benefits. [R. 26]. The SSA Appeals Council denied Mr. Hart's Request

for Review on November 24, 2014. [R. 1]. On April 9, 2016, Mr. Hart filed a complaint with this

Court, seeking to reverse or remand the Commissioner's decision pursuant to § 205(g) of the

Act. [ECF. No. 1].

## C.    Factual and Medical Background

Mr. Hart was born on April 24, 1981. [R. 83]. He currently lives in Chelsea,

Massachusetts. [R. 83]. He is a high school graduate, and has previously worked as a cashier,

telemarketer, waiter, and home health aide. [ECF No. 17 at 4]. He alleges disability due to

bipolar disorder and sleep apnea. [R. 85].

---

[1] References to pages in the Administrative Record [ECF No. 9] are cited as "[R.__ ]."

i. <u>Mental Health</u>

The medical evidence submitted as part of the administrative record, which the ALJ considered in making his ultimate decision, indicates that, on October 25, 2010, Mr. Hart was first seen in connection with his bipolar disorder, which he claimed had been diagnosed two-and-a-half years prior. [R. 330–35]. Mr. Hart had recently moved to Massachusetts from Florida. [R. 331]. He reported that he would get depressed at "the drop of a pin," but would return to "normal" in no time. [R. 330]. He stated that he was in a state of hopelessness regarding his relationship, friends, and job status, and was experiencing anxiety symptoms including obsessive thoughts, nervousness, and avoidance of social interactions. [R. 333]. On December 1, 2010, Mr. Hart was seen again at Boston Medical Center. [R. 340]. Kathleen Fuentes, APRN, wrote at that time that Mr. Hart "doesn't present as depressed and doesn't meet criteria for [major depressive disorder] or bipolar issues" and "would benefit from therapy." [R. 340]. Ms. Fuentes also recommended that he try taking Prozac, which he agreed to. [R. 341]. When he was seen by a provider on December 6, 2010, Mr. Hart reported that Prozac was having "positive effects" and that he believed he could hold a part time job, but that he was worried about the stress involved with work. [R. 336–37].

In June 2011, Tfawa Haynes, LICSW at Fenway Health conducted a mental health evaluation of Mr. Hart, diagnosed him with bipolar affective disorder, and recommended treatment for moderate depression and anxiety [R. 598–02]. On September 8, 2011, Mr. Hart returned to Fenway Health, where he saw Jennifer Lakins, LMHC. [R. 593]. He reported symptoms of depression, impulsive spending, panic attacks in crowded areas, and a feeling that "people are out to get [him]." [R. 593].

On February 22, 2012, Erwin Ilano, M.D., treated Mr. Hart, who reported that the prescribed medication was effectively reducing his anxiety, that his mind was not as "rampant," and that he was more in control of his situation. [R. 577]. Dr. Ilano observed that his speech rate, rhythm, and volume were normal, and that there were no psychomotor changes. Id. Mr. Hart displayed no signs of overt psychosis and no gross cognitive deficits. Id. He assigned Mr. Hart a Global Assessment of Functioning ("GAF")[2] score of 59. [R. 578].

On March 29, 2012, Dr. Ilano again treated Mr. Hart, who complained that he was "feeling more depressed and anxious and [was] having difficulty taking care of himself." [R. 575]. He also reported insomnia, mood swings, feelings of hopelessness, and intermittent suicidal thoughts. Id. In response, Dr. Ilano increased Mr. Hart's dosage of Lamictal from 100mg to 150mg for mood stabilization, and recommended a "day treatment program for stabilization." [R. 576].

On April 24, 2012, Dr. Ilano saw Mr. Hart, who stated that his mood had improved after the medication increase and that he had found temporary housing, but that he had trouble concentrating. [R. 569]. Dr. Ilano observed that his mood and affect were sad, that his speech rate, volume, and rhythm were normal, that there were no psychomotor changes or overt psychosis, and that his insight and judgment were intact. Id. He recommended continuing weekly counseling and support, and continued use of the medication already prescribed. [R. 570].

During a follow-up visit in July 2012, Mr. Hart told Dr. Ilano that he was still experiencing "ups and downs," but that this had become more manageable with treatment. [R. 567]. In subsequent visits in August and September 2012 with Dr. Ilano, Mr. Hart reported that

---

[2] The GAF rating system "provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." Gonzalez-Rodriguez v. Barnhart, 111 Fed. App'x 23, 24 (1st Cir. 2004).

his mood was stable and denied any symptoms of depression and anxiety. [R. 558, 560]. In December 2012, however, he reported to Dr. Ilano that he was "struggling with depression and loneliness," partly due to his living and financial situation at that time. [R. 553]. At every visit, Dr. Ilano observed that Mr. Hart's speech rate, volume, and rhythm were normal, there were no psychomotor changes, no overt psychosis, and that his insight and judgment were intact. [R. 553].

Dr. Ilano saw Mr. Hart again in February, April, and June of 2013. [R. 543, 551, 664]. Mr. Hart reported struggling with the death of his ex-boyfriend [R. 551] and with "feeling that he's not home" [R. 543]. In June, he stated that he broke up with his then-boyfriend but engaged in physical activities and had supportive friends that he could talk to online. [R. 664]. Dr. Ilano consistently observed that Mr. Hart's speech rate, volume, and rhythm were normal, there were no psychomotor changes, no overt psychosis, no gross cognitive deficits, no signs of suicidal or homicidal ideation, and that his insight and judgment were intact. [R. 551, 543, 664]. In April and June, Dr. Ilano also observed that Mr. Hart's "[t]hought process is linear and goal directed," he was "alert and oriented," and presented with no "gait problems." [R. 543, 664]. Dr. Ilano assigned Mr. Hart GAF scores of 60 and 59 in April and June, respectively. [R. 544, 664].

In March 2013, Mr. Hart visited Dr. Joseph Baker, his primary care physician, where an examination revealed that he was well nourished, hydrated, and in no apparent distress and a review of his systems (e.g., eyes, neurological) was negative. [R. 547–48]. It further revealed that he might have had a kidney stone and otherwise documented an existing mood disorder and sleep apnea. Id. A physical exam in August 2013 returned similar results. [R. 659–61]. That same month, near the time that Mr. Hart's application for SSDI benefits was originally denied, Dr. Ilano and Dr. Baker each completed an "Emergency Aid to the Elderly, Disabled, and

Children" ("EAEDC") Report[3] regarding his medical history, current condition, and eligibility for state disability benefits. [R. 676–86]. The report indicated diagnoses of obstructive sleep apnea and bipolar disorder that would be expected to affect Mr. Hart's ability to work for a period longer than one year. [R. 683–84]. Dr. Ilano noted that some of his daily activities, including personal hygiene and dressing, ordinary housework, and visiting family/friends, would be impacted because he had difficulty completing tasks and had minimal social contact. [R. 685–86].

Dr. Ilano's notes of visits with Mr. Hart in October 2013 and January 2014 closely resembled his notes from earlier visits, including that Mr. Hart appeared "alert and oriented" and his "[t]hought process [was] linear and goal directed." [R. 735, 728]. In October, Mr. Hart reported improvement due to an increase in his medication dosage, and in January, he felt generally "ok."

Following his appointment with Dr. Ilano in January 2014, Mr. Hart began therapy at Fenway Health with James Lunderville, a social worker. [R. 729]. Mr. Lunderville noted that Mr. Hart had a "[m]ore stable living environment," but that he needed to develop better interpersonal skills, tolerance to emotional changes, and anger management. Id.

On March 17, 2014, Mr. Hart told Dr. Ilano that he was "going good," but noted that he had low energy, fatigue, and had increased difficulty completing tasks. [R. 726]. Otherwise, Dr. Ilano observed that Mr. Hart's speech rate, volume, and rhythm were normal; that there were no psychomotor changes, overt psychosis, and no suicidal or homicidal ideation; and that his insight

---

[3] EAEDC is a Massachusetts state benefits program available to, among others, citizens of Massachusetts deemed to be disabled. 106 Mass. Code Regs. § 320.000. In order to qualify for the program, an EAEDC medical report must be completed by a "competent medical authority." Id. § 320.200.

and judgment were intact. Id. He also noted that Mr. Hart's "[t]hought process is linear and goal directed" and that he appeared "[a]lert and oriented." Id.

Shortly thereafter, Dr. Ilano and Mr. Lunderville completed a Mental Residual Functional Capacity ("RFC")[4] Form with an addendum and opinion letter [R. 687–91], in which Dr. Ilano stated that Mr. Hart was diagnosed with Axis I bipolar II disorder and Axis II personality disorder, NDS, and that he "does not have the coping skills or necessary interpersonal skills to maintain employment." [R. 691]. Mr. Lunderville noted in the Mental RFC Form that Mr. Hart's condition would preclude him from performing certain job duties for more than 10% of an eight-hour workday, including those that would require working in coordination or close proximity with others, completing a normal workday without interruption from psychologically-based symptoms, responding appropriately to changes in the work setting, and setting realistic goals and plans independently of others. [R. 689–90]. The form also indicated, however, that he could perform other work-related functions, including, among others, understanding and remembering simple and detailed instructions, maintaining attention and concentration for long periods, making simple decisions, asking for assistance, and being aware of hazards. Id.

In April 2014, Dr. Baker completed a Physical Capacities Evaluation and a Physical RFC form, in which he stated that he believed Mr. Hart was disabled from competitive substantial gainful employment, and that if he attempted to work he would be likely to miss at least three days of work per month. [R. 700]. In May 2014, Dr. Ilano completed another Mental Health RFC Form, in which he concluded that Mr. Hart's psychological condition had worsened since March

---

[4] The SSA defines "Residual Functional Capacity" (RFC) to take into account an individual's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [he or she] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The Administration defines RFC to be "the most you can still do despite your limitations." Id.

2014 and that his capacity to perform work had diminished since his prior assessment. [R. 702–03].

ii.   <u>Sleep Apnea</u>

On June 17, 2011, Mr. Hart underwent a sleep study and was diagnosed with sleep apnea. [R. 485]. Robert J. Thomas, M.D., recommended that Mr. Hart begin using a continuous positive airway pressure ("CPAP") device. [R. 485]. On July 15, 2011, Mr. Hart saw Jacqueline Chang, M.D., and told her that over the preceding several months he had begun falling asleep in public and had particularly restless sleep, including one to two nightly arousals. [R. 491–93]. Later in July 2011, Mr. Hart saw Dr. Baker, who noted that Mr. Hart had begun using the CPAP device and that it was helping alleviate his symptoms. [R. 596]. In follow-up visits with Dr. Baker in October and December 2011, Mr. Hart continued to report that the CPAP treatment was going well. [R. 589, 591].

In November 2013, Mr. Hart reported to Dr. Chang that his sleep had worsened as a result of his sleep apnea, even while using the CPAP device. [R. 697]. Dr. Chang noted that "excessive sleepiness and concentration difficulties were causing significant impairment" and that Mr. Hart had recently undergone another sleep study, which resulted in adjustments to his CPAP machine. [R. 697, 759]. In a March 2014 Sleep Disorders RFC Questionnaire, Dr. Chang, who had not seen Mr. Hart again since his November 2013 visit, reported that Mr. Hart was experiencing recurrent daytime "sleep attacks" two times per week, and that these attacks were caused by disturbances in his regular sleep routine. [R. 693].

**D.   Hearing**

On July 10, 2014, the ALJ held a hearing at which Mr. Hart testified. He was questioned directly by the ALJ and his own attorney. [R. 35, 63]. The ALJ asked Mr. Hart about his

personal, educational, professional, and medical history. [R. 33–70]. With regard to his mental condition, Mr. Hart told the ALJ that he had depression and bipolar disorder. [R. 45]. He testified that he felt depressed "pretty much every day." [R. 46]. He further testified that he often felt fatigued, a "lack of interest in almost everything and everyone," and an inability to interact with others. Id. When the ALJ asked Mr. Hart specifically about the symptoms of his bipolar disorder, Mr. Hart testified that he often experienced depressive symptoms of bipolar with occasional bouts of manic symptoms. [R. 47]. With regard to his treatment, Mr. Hart testified that his condition had improved, but that he still felt the effects of depression. [R. 48]. The ALJ also questioned a vocational expert, who testified that Mr. Hart's medical conditions would likely prevent him from performing jobs he held in the past, but that, accounting for Mr. Hart's limitations, significant jobs existed in the national economy that Mr. Hart was capable of performing. [R. 70–77].

With respect to sleep apnea, Mr. Hart testified that he was first diagnosed with sleep apnea three years prior. [R. 48]. The ALJ asked if Mr. Hart had experienced "significant improvement" as a result his sleep apnea treatment, to which Mr. Hart answered "[f]or the most part, yes." [R. 49]. He testified that he no longer found himself "falling asleep in the middle of doing daily activities" and that he often slept seven or eight hours per night. [R. 49–50].

### E.    State-Agency Medical Consultants

Two state-agency medical consultants evaluated Mr. Hart's claims for disability based on bipolar and sleep apnea and determined that his "affective disorder," but not sleep apnea or obesity, was a severe impairment. [R. 111, 123]. They described the affective disorder as "disturbance of mood, accompanied by a full or partial manic or depressive syndrome as evidenced by the following: Bipolar syndrome with a history of episodic periods manifested by

the full symptomatic picture of both manic and depressive symptoms (and currently characterized by either or both syndromes)." [R. 112, 124]. The consultants noted that Mr. Hart was either only moderately or not significantly limited with respect to various concentration or persistence metrics, and that his periodic bouts of depression resulted in difficulties with focus, but that treatment and medication enabled Mr. Hart to sustain focus and pace on simple tasks. [R. 113–14, 125–126]. They further noted that, with respect to Mr. Hart's social interaction limitations, he could be impulsive and would do best in a setting with occasional public contact and a supportive supervisor. [R. 114, 126]. They stated that Mr. Hart improved with medication and was somewhat reactive when stressed. Id. His then-current GAF score was 60 and the consultants concluded that he was not disabled. [R. 116, 126, 128].

### F. ALJ Decision

In reaching his decision, the ALJ applied the required five-step framework. See Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). First, he concluded that Mr. Hart had not engaged in substantial gainful activity since the alleged onset of his disability. [R. 15 at ¶ 2].

At step two, the ALJ concluded that Mr. Hart's depression was a severe impairment, meaning that "the impairment[] ha[d] more than a minimal effect on [Mr. Hart's] ability to perform basic work-related activities." [R. 15 ¶ 3]. In reaching this determination, he considered record evidence, including records of Mr. Hart's treatment by Dr. Ilano, Dr. Baker, and Mr. Lunderville from 2012 to 2014, which reflected that Mr. Hart had been treated for symptoms of depression. [R. 16–19]. The ALJ also considered the report prepared by the state-agency psychological consultants in October 2013, detailing Mr. Hart's history of depression as well as the improvement in his condition once medicated. [R. 16]. Additionally, the ALJ considered the

record of Mr. Hart's treatment for sleep apnea and concluded that Mr. Hart's sleep apnea was not a severe impairment as defined by the Act. [R. 19–20].

At step three, the ALJ found that Mr. Hart did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in the relevant regulations. [R. 20 ¶ 4]. The ALJ noted that for a mental impairment to satisfy a listed impairment, it "must result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." [R. 20]. The ALJ concluded that Mr. Hart had "mild" restrictions in the activities of daily living and "moderate" difficulties in other areas, such as social functioning, concentration, persistence, and pace, but that none of these limitations were "marked" as required to qualify for disability benefits. [R. 20–21].

At step four, the ALJ first identified any "underlying medically determinable physical or mental impairment[s] . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "could reasonably be expected to produce the claimant's pain or other symptoms." [R. 22]. The ALJ next assessed the limitations caused by the identified impairments, "evaluat[ing] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." [R. 22] The ALJ determined that Mr. Hart had "medically determinable impairments," which "could reasonably be expected to cause the alleged symptoms," but that Mr. Hart's "statements concerning the intensity, persistence and limiting effects of those symptoms" were not wholly credible. [R. 22]. The ALJ, considering Mr. Hart's testimony and the medical record before him, determined that Mr. Hart had the RFC to perform work at all exertional levels but limited to

simple, routine tasks, a low stress environment, and only occasional brief interactions with the public and co-workers. [R. 21]. He credited the opinions of the state-agency psychological consultants, Mr. Hart's GAF score, and the available objective medical evidence. [R. 23]. He gave less weight to the opinions of Dr. Ilano, Dr. Baker, and Mr. Lunderville. Id.

The ALJ concluded that although Mr. Hart could not perform any past relevant work, a significant number of jobs existed in the national economy that Mr. Hart was capable of performing, given his age, education, work experience, and RFC, such as working as a cleaner, groundskeeper, office helper, or hotel housekeeper. [R. 24 at ¶¶ 6, 10]. Therefore, the ALJ determined that Mr. Hart had not been disabled as defined by the Act from the date he claimed the onset of disability to the date of the ALJ's decision. [R. 25 at ¶ 11].

## III.   STANDARD OF REVIEW

This Court has jurisdiction pursuant to § 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the Court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). The Court may not consider any new evidence the claimant presents that was not contained within the administrative record. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to

sentence six of section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the Court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such a review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the Court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec. of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec. of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## IV.    DISCUSSION

Mr. Hart argues that the ALJ, in deciding that Mr. Hart was not disabled and therefore ineligible for benefits, erred by: 1) finding that Mr. Hart had the severe impairment of depression, but not bipolar disorder; 2) failing to give appropriate weight to the opinions of his treating medical providers; and 3) finding that Mr. Hart was not entirely credible in his subjective complaints.

### A.    Step Two Finding of Severe Impairment of Depression

Mr. Hart first argues that the ALJ's step two finding, that Mr. Hart had the severe impairment of depression, was a mischaracterization and possibly a misunderstanding of the mental disorder that Mr. Hart actually suffered from. He contends that the fact that he was diagnosed with bipolar disorder rather than depression is well supported by the administrative record, and that it is therefore possible that the ALJ did not properly evaluate Mr. Hart's claim. Bipolar disorder, as alleged by Mr. Hart, is a "more complex diagnosis" and causes the "manic symptoms" that were reflected in Mr. Hart's psychological condition. The Commissioner does not dispute these assertions, but argues that the ALJ's findings do not constitute reversible error.

Step two of the five-step process is understood to be a "de minimis policy" for determining whether a claimant has brought a claim with merit and "do[es] no more than screen out groundless claims." McDonald v. Sec'y of Health and Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986); see also SSR 85-28, 1983–1991 Soc. Sec. Rep. Serv. 390 (Jan. 1, 1985) ("A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe . . . . Great care should be exercised in applying the not severe impairment concept.").

Although the absence of a severe impairment at step two ends the inquiry, once there is a finding of <u>any</u> severe impairment, the ALJ is instructed, in determining the claimant's residual functioning capacity, to "consider the limiting effects of <u>all</u> [the claimant's] impairment(s), even those that are not severe." 20 C.F.R. § 404.1545 (emphasis added); <u>see also</u> <u>Viveiros v. Astrue</u>, No. 10-11902-DJC, 2012 WL 4104794, at *9 n.4 (D. Mass. Sept. 19, 2012). "[A]s long as the ALJ [finds] at least one severe impairment so that the sequential evaluation progress[es] to the next step, an error at Step Two does not require reversal." <u>Dunham v. Astrue</u>, No. 10-cv-40246-TSH, 2013 WL 1192406, at *8 (D. Mass. Mar. 21, 2013); <u>see also</u> <u>Perry v. Astrue</u>, No. 11–40215–TSH, 2014 WL 4965910, at *4 (D. Mass. Sept. 30, 2014) ("Here, any error at step two was harmless because the evaluation proceeded past step two and the ALJ considered all of Plaintiff's impairments at step four.").

Even assuming error, reversal or remand is unwarranted on the basis of the ALJ's alleged failure to conclude that Mr. Hart's bipolar disorder was a severe impairment because the ALJ considered all mental impairments evident in the record, severe or non-severe, as he proceeded to determine whether Mr. Hart was eligible for benefits. In completing that analysis, the ALJ plainly considered the symptoms of all of Mr. Hart's impairments in determining his RFC, including Mr. Hart's alleged back and leg pain, sleep apnea, mental condition, and the limitations of these impairments. [R. 20–24]. Moreover, the ALJ's lengthy discussion of Mr. Hart's medical history—including Mr. Hart's visits and treatments for bipolar disorder and record evidence revealing symptoms associated with the disorder, like mood swings, emotional reactivity, limited coping skills, and difficulty sustaining attention—indicates that he did not misunderstand or mischaracterize Mr. Hart's mental impairments. <u>See</u> [R. 15–20].

## B.    Weight Given to Opinions of Treating Practitioners

Mr. Hart next contends that, in steps four and five where the ALJ analyzed Mr. Hart's RFC to perform work, he erred in granting little weight to the medical opinions of his treating medical providers, including Dr. Ilano, Dr. Baker, and Mr. Lunderville, who thought Mr. Hart was disabled, while granting greater weight to the opinion of state-agency psychological consultants. See [R. 23]. Mr. Hart asserts that the relevant regulations required the ALJ to give greater weight to examining and treating physicians than to non-examining physicians.

An ALJ does not have to give the medical opinion of a treating physician controlling weight unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and also is "'not inconsistent' with the other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996).[5] In determining how much weight to give a treating medical source, the ALJ considers the nature and extent of the treatment relationship, the supportability of medical opinions by medical signs and laboratory findings, the consistency of the opinion, and other factors. 20 C.F.R. § 404.1527(c). "To be inconsistent, evidence only need 'be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion.'" Sanchez v. Colvin, 134 F. Supp. 3d 605, 615 (D. Mass. 2015) (quoting SSR 96-2p, 1996 WL 374188, at *3); see also Lewis v. Colvin, No. 15-12223-FDS, 2016 WL 4007556, at *10 (D. Mass. July, 26, 2016) ("[T]he ALJ did not act improperly in deciding not to give controlling weight to the opinions of [claimant's] treating physicians nor did he err in deciding to give those of the state

---

[5] Social Security Rulings ("SSRs") "are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35.

agency consultants significant weight, as the latter opinions were supported by substantial evidence.").[6]

Mr. Hart also asserts that the ALJ was required to provide him with "a detailed and well-reasoned finding of why the opinions of his treatment team were not granted deference." [ECF No. 17, 15]. An ALJ is required to provide "good reasons" for the weight he gives the opinions of treating sources, and the resulting conclusion ultimately must be supported by substantial evidence. Taylor v. Astrue, 899 F. Supp. 2d 83, 87–88 (D. Mass. 2012); Ward, 211 F.3d at 655. Further, the ALJ must resolve any conflicts between medical evidence and opinions. Partridge v. Astrue, 754 F. Supp. 2d 192, 197 (D. Mass. 2010) (citing Irlanda Ortiz v. Sec'y of Health and

---

[6] Mr. Hart also contends that the SSA cannot require a claimant to provide objective medical tests or data to support his or her application for benefits when alleging symptoms that are not objectively diagnosed. [ECF No. 17 at 15]. The cases cited in support of this proposition appear largely inapposite to this case. For example, in Green-Younger v. Barnhart, 335 F. 3d 99, 106 (2d Cir. 2003), the Second Circuit held that the ALJ erred in requiring objective evidence beyond clinical findings to credit a diagnosis of severe fibromyalgia. Here, however, the ALJ did not require objective medical evidence, such as medical tests or data, beyond what existed in the record in order to substantiate the diagnosis and actually considered all the evidence in the record, including the doctors' treatment notes and clinical observations, in assessing the limitations of Mr. Hart's disorder. Moreover, the cases cited by Mr. Hart all involve fibromyalgia, rather than bipolar disorder, and Mr. Hart does not establish that these conditions are sufficiently analogous for the fibromyalgia cases to be instructive.

Mr. Hart further contends that the ALJ was not permitted to grant little weight to treating sources without first contacting them for clarification of their opinions, but this understanding is clearly based on a version of the regulations that was inapplicable at the time of the ALJ's decision in November 2014. Compare 20 C.F.R. §§ 404.1512(e) (2011), 416.912(e) (2011) (requiring recontacting medical source if inadequate to reach disability determination) with 20 C.F.R. §§ 404.1512 (2014), 416.912 (2014), 416.920b (2012) (noting possibility, but not creating requirement, to recontact medical source). Moreover, even under the dated regulations, "[a]n ALJ must contact the medical source only when there is ambiguity in the opinion of the treating physician, not when evaluations are inconsistent with other information in the record or when the ALJ finds the treating physician's opinion unpersuasive." Abubakar v. Astrue, No. 11-cv-10456-DJC, 2012 WL 957623, at *11 (D. Mass. Mar. 21, 2012). Here, Mr. Hart does not argue that the treating medical opinions were actually ambiguous rather than inconsistent with the other evidence, as the ALJ explained.

Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)). "[A]n ALJ may discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians." Perry v. Colvin, 91 F. Supp. 3d 139, 151–52 (D. Mass. 2015).

Here, the ALJ satisfied these burdens by providing the rationale underlying his decision not to give the opinions of Dr. Ilano, Dr. Baker, and Mr. Lunderville controlling weight, which is supported by substantial evidence. The ALJ granted little weight to these medical opinions because the available objective evidence did not support their assessments. [R. 23]; see Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994) ("When a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply.").

Dr. Ilano's March 2014 Mental RFC assessment indicated that he believed that Mr. Hart's irritability, affective instability, and deficits in interpersonal skills would make it unlikely that Mr. Hart would be able to maintain stable employment. [R. 688, 691]. The ALJ, however, is not bound to accept the treating physicians' conclusions about whether a patient is disabled or not. See 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Although Dr. Ilano's examination notes indicate that Mr. Hart reported psychological "ups and downs" and periods of depression through the course of his treatment [R. 553, 567, 569, 664, 735, 743, 757], the ALJ explained that Dr. Ilano consistently observed that Mr. Hart did not show signs of speech abnormality, cognitive deficits, thought disorder, or psychosis. [R. 23]; see 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); see also Pope v. Barnhart, 57 F. App'x

897, 899 (2d Cir. 2003) ("[W]here the inconsistencies do not appear resolvable, the ALJ may decide based on the available evidence." (citing 20 C.F.R. § 404.1527(c)(4))). The ALJ also properly considered the fact that Dr. Ilano found Mr. Hart to have a GAF score near 60, indicating only moderate difficulty in social functioning. [R. 23]; see Grant v. Colvin, No. 13-13102-DHH, 2015 WL 4945732, at *8 (D. Mass. Aug. 20, 2015) (upholding ALJ decision that relied on GAF scores between 55 to 65 to determine that claimant would experience moderate or mild, rather than marked, difficulty in functioning). Overall, Dr. Ilano's regular treatment notes were not fully consistent with the RFCs and the ALJ's opinion that the treatment notes were more reliable was adequately supported by the objective evidence.

The ALJ also found that the opinions of Dr. Baker and Mr. Lunderville were similarly unsupported by objective evidence in the record. Dr. Baker claimed in a RFC form that Mr. Hart would be expected to miss more than three days of work per month [R. 700], which the ALJ considered and found to be unsupported by any objective evidence in the record [R. 23]. With respect to Mr. Lunderville, the ALJ was not required to provide good reasons for rejecting his opinion because a social worker is not considered to be an "accepted medical source." Taylor, 899 F. Supp. 2d at 88 (noting that nurses, like social workers, are not among the "'accepted medical sources' listed in 20 C.F.R. § 416.913(a)"); see also Escobar v. Colvin, No. CIV.A. 13-10186-JGD, 2014 WL 1159822, at *13 (D. Mass. Mar. 20, 2014) (noting that social workers are not "acceptable medical sources" entitled to controlling weight). Nonetheless, the ALJ also found that Mr. Lunderville's assessment of Mr. Hart's limitations was unsupported by objective medical evidence because he did not report any "signs, symptoms, or findings" and was based on only four to five therapy sessions within a short span of the entire claimed period of disability. [R. 23]. Further, the ALJ noted that the record did not evidence any significant issues with

missed appointments. Id. In deciding to give the state-agency psychological consultant's opinion greater weight, the ALJ explained that it was consistent with and supported by the objective medical evidence, including Mr. Hart's moderate GAF scores and the mental status exam findings showing no speech abnormality, cognitive deficits, thought disorder, or psychosis. [R. 23–24].

Accordingly, based on the Court's review of the administrative record and the ALJ's decision, it concludes that the ALJ's decision about the relative weight assigned to the medical opinions of Mr. Hart's treating sources is supported by substantial evidence.

### C.    Credibility Determination

Lastly, Mr. Hart argues that the ALJ erred in finding that Mr. Hart's "statements concerning the intensity, persistence, and limiting effects of [the alleged] symptoms are not entirely credible." [R. 22]. In determining his credibility, Mr. Hart contends that the ALJ relied too heavily on Mr. Hart's description in his July 10, 2014 testimony of his daily activities without considering how they are vocationally relevant, and that the ALJ failed to consider all the relevant factors enumerated in 20 C.F.R. § 404.159(c)(1) and Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 2001).

In Avery, the First Circuit held that an ALJ must consider certain factors in making a determination about a claimant's subjective complaints about pain or other symptoms. Avery, 797 F.2d at 29. These factors include: "(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) Treatment, other than medication, for relief of pain; (5) Functional restrictions; and (6) The claimant's daily activities." Id. The factors are also set forth at 20 C.F.R.

§§ 404.1529(c)(3) and 416.929(c)(3). The relevance of the factors varies depending on a claimant's impairments and symptoms, and the ALJ "need not expressly discuss every enumerated factor." Balaguer v. Astrue, 880 F. Supp. 2d 258, 268 (D. Mass. 2012). Avery is understood to require ALJs to consider the Avery factors at the hearing and in reaching their determination, but it does not require that the ALJ provide "an explicit written analysis of each factor." See Vega v. Astrue, No. 11-cv-10406-WGY, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012). Further, in a Social Security Disability case, "[a] fact-finder's assessment of a party's credibility . . . is given considerable deference and, accordingly a reviewing court will rarely disturb it." Anderson v. Astrue, 682 F. Supp. 2d 89, 96 (D. Mass. 2010); see also Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.").

At the July 2014 hearing, Mr. Hart testified about his bipolar disorder, depression, sleep apnea, and leg pain. The ALJ asked him questions concerning the nature, location, onset, duration, frequency, and intensity of his symptoms. See [R. 39, 46, 47, 48, 49, 61]; see also [R. 63, 64, 67, 68] (testimony from examination by Mr. Hart's attorney). The ALJ heard testimony concerning factors that aggravate and precipitate symptoms of Mr. Hart's conditions. See [R. 56, 63]. Mr. Hart testified about the efficacy and side effects of his medication, as well as the counseling treatment he had been receiving. See [R. 47, 49, 50, 58, 59, 60, 62, 66, 67]. Mr. Hart also spoke about the ways in which his conditions and their symptoms limit his ability to function in a work environment. See [R. 39, 65, 80]. The ALJ asked Mr. Hart numerous questions concerning his daily activities, including his routine, social life, family, and hobbies.

See [R. 50–57]. Contrary to Mr. Hart's contention, these questions and testimony indicate that the ALJ undertook a comprehensive consideration of the Avery factors in reaching a determination regarding the credibility of Mr. Hart's subjective complaints.

Furthermore, the ALJ's written decision includes numerous references to the information offered by Mr. Hart at the hearing, including the nature of his symptoms, the efficacy and side effects of his medication, and the effect of his counseling treatment, in addition to information about his daily activities. Specifically, he noted that Mr. Hart "does experience[] limitations related to his depression," but "has not required any psychiatric hospitalizations, residential care, or placement in a day program . . . lives independently in an apartment by himself . . . is able to care for his personal needs . . . travel independently . . . manage his finances," among other activities. [R. 23]. The ALJ concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely credible" in light of the objective medical evidence and entire case record. [R. 22–23]; see Bazile v. Apfel, 113 F. Supp. 2d 181, 185 (D. Mass. 2000) ("In determining the weight to be given to allegations of pain . . . complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." (quoting Dupuis v. Sec'y of Health & Human Servs., 869 F.2d 622, 623 (1st Cir.1989))). Thus, the record shows that the ALJ adequately considered the Avery factors in reaching his credibility decision.

Accordingly, the Court concludes that the ALJ's determination that Mr. Hart's statements concerning his symptoms were not entirely credible was supported by substantial evidence.

## V.    CONCLUSION

For all the reasons detailed above, Mr. Hart's motion to reverse or remand [ECF No. 16] is DENIED, and the Commissioner's motion to affirm [ECF No. 19] is ALLOWED.

**SO ORDERED.**

Dated: August 21, 2017                              /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE